Submitted on brief October 27, affirmed November 23, 1915.

## STALKER v. STALKER.*

(153 Pac. 52.)

**Specific Performance — Parol Contract for Sale of Land — Part Performance.**

1. The taking possession of real estate pursuant to an oral contract for the sale thereof is such part performance as will take the contract out of the statute of frauds unless the relation of affinity or consanguinity exists between the vendor and purchaser, in which case the making by the purchaser of valuable improvements in addition to the taking of possession is essential to specific performance of the contract.

**Specific Performance—Parol Contracts—Evidence—Sufficiency.**

2. Evidence *held* to justify a finding that a husband orally contracted to convey land to his plural wife, and that she took possession of the land relying on the contract and made valuable improvements thereon authorizing her heirs to compel specific performance.

[As to the certainty essential to a contract that is to be specifically performed, see note in 26 **Am. Dec.** 661.]

From Baker: GUSTAV ANDERSON, Judge.

---

*On sufficiency of possession alone as ground for granting specific performance of parol gift of or contract to convey real property, see note in 8 **L. R. A. (N. S.)** 870.     REPORTER.

In Banc.     Statement by MR. CHIEF JUSTICE MOORE.

This is a suit by E. Lucille Stalker and others against Alexander R. Stalker and others to quiet the title to real property.   The material facts are that on March 22, 1882, when Section 5352, Revised Statutes of the United States, denouncing bigamy, was amended, Emily E. Stalker was a plural wife of Alexander Stalker, and both were members of the Church of Jesus Christ of Latter Day Saints and then residing in the territory of Idaho, where their sons and daughters, the plaintiffs, were born prior to January 1, 1883, and each was legitimated by Section 7 of the amended enactment: 22 U. S. Stats., c. 47.   Mr. Stalker, fearing prosecution for polygamy in Idaho, determined to put away such plural spouse and for that purpose he came, in the summer of 1886, to Pine Valley, Baker County, Oregon, where he purchased the northwest quarter of section 26 in township 7 south, range 45 east, of the Willamette Meridian, paying for the land $700, and also laying out about $300 in building an addition to the house on the premises.   In the fall of that year he caused the plaintiffs and their mother to be removed to and settled upon this land. He took the title to that quarter section in his own name, so that if the plural wife became discouraged she could not immediately sell, convey or mortgage the real property, and with the money thus obtained return to her former home and trouble him.   The next year after the plaintiffs and their mother were taken to the land, Mr. Stalker went back to Idaho and never returned to Oregon.   At the time the tract was purchased, there were only a few acres of it improved, but the plaintiffs removed the brush growing on the premises, cleared about 70 acres, and made many perma-

nent and valuable improvements upon the real property until it is now worth about $6,000 as a result of their labor. Mr. Stalker collected the rent of the premises while he so occupied them, but thereafter the plural wife lived upon the land or received the rents accruing from a lease thereof.' He, for a consideration of $25, conveyed to the plaintiff E. Lucille Stalker 1¾ acres of the premises, and he has paid the taxes annually imposed on the land to and including the levy for the year 1910. The plural wife, on August 10, 1910, wrote Mr. Stalker a letter from which an excerpt is taken, viz.:

"The man who has the farm, his lease will expire this fall, and like all rented places 'tis in a bad shape. I left it fenced and house in good repair, but it will take some money to fix it up, so I think it would be only right for you to give me the deeds and I can sell the place. This you will think a big demand but I think 'tis a small compensation for the many years I was your willing slave for you and your entire family."

Replying to such solicitation, he wrote her as follows:

"Agreeable to request, I am making an effort to furnish you a legal deed to your home in Pine Valley. * * The original deed would not be of any service to you, therefore I suggest that you draw up a deed, taking Lucille's as a basis, describing the parcel of land Lucille owns in the premises. I ask this to make her safe, and because I cannot describe it. Give the metes and bounds carefully, fill out the whole matter agreeably to the method they do such things in Oregon, then send to me and I will have it attested and sworn to before a notary public and returned to you."

He on December 20, 1910, mailed to his son, the defendant Alexander R. Stalker, a letter wherein he referred to the plaintiff Walter R. Stalker, saying:

"I write in regard to my property in Pine Valley. Emily has through a lawyer in Portland written to me requesting me to give her a deed to the property there. I thought the matter over and concluded to do so, and wrote to her to that effect, as it has been an elephant on my hands through all these years. But have since written to Wallace and he tells me that the property there is worth fifteen or sixteen thousand dollars. How is that, or do you know anything about values there? If he is correct about that, that would be giving her too great an advantage over the rest of you. The deed I received today to be filled out and signed. How does this appeal to you? I wish to do the right thing all around but if Wallace's estimate of the property is near right, this would be a wrong to the rest of you, and therefore the only thing left for you would be to take out an injunction and prevent it (I mean your mother's children). I had a misconception regarding the value of the property if he is any where near correct. I have had a number of persons writing from Pine who wished to buy, Wallace among the number, but I studiously refused to sell not wishing to leave the family without a home. What have you to advise in the premises? Tell me what you know without reserve at your earliest convenience. I have been to great expense paying taxes, water suit, etc."

No deed was returned from Mr. Stalker, who died in March, 1912, and the plaintiffs' mother died November 14th of that year. Hortensia Stalker, the first and legal wife, died in the year 1908, leaving then surviving her husband Alexander Stalker and their sons and daughters, the defendants in this suit.

The complaint alleges that the plaintiffs are the heirs at law of Emily E. Stalker, who died intestate; that they and their mother were removed by Alexander Stalker and settled upon the land in Baker County, Oregon, "under a verbal contract and agreement that the said tract or parcel of land should be the property

of said Emily E. Stalker, and the said Emily E. Stalker then and there was put into and took possession of said land under said verbal agreement and contract that the same should be conveyed to her''; that she had undisputed possession of the land which she cultivated more than 26 years and up to the time of her death, since which the plaintiffs have been in possession of the premises, except a small portion thereof which with the consent of their mother was conveyed by their father to the plaintiff E. Lucille Stalker. Reference is then made to the correspondence between their mother and father, as hereinbefore set forth, and it is further alleged, upon information and belief, that pursuant to such agreement and correspondence their father executed to their mother a deed to the premises, which deed was either lost in the mail, or destroyed by some person to whom it was intrusted by the grantor to be posted to the grantee; and that the plaintiffs are informed and believe that the defendants, as the heirs of Alexander Stalker, are claiming an adverse interest in the land.

The answer denies the material averments of the complaint, and for a separate defense and by way of cross-bill alleges that the defendants are the sole heirs at law of Alexander Stalker, deceased, the issue of his legal marriage with their mother his first and only wife; that no marriage ever occurred between their father and the plaintiffs' mother; and that their father died seised of an estate of inheritance in and to the real property described in the complaint, to all of which they are entitled by inheritance.

The reply put in issue the allegations of new matter in the answer, and, the cause having been tried, the plaintiffs secured a decree as prayed for in the complaint, and the defendants appeal.          AFFIRMED.

For appellants there was a brief over the names of *Mr. William H. Strayer* and *Mr. William Smith.*

For respondents there was a brief submitted by *Mr. L. C. Garrigus, Mr. John L. Rand, Mr. A. A. Smith* and *Mr. William H. Packwood, Jr.*

Opinion by Mr. Chief Justice Moore.

It is contended that as Emily E. Stalker was living upon the land in Baker County, Oregon, when Alexander Stalker returned to Idaho, she did not take possession of the premises under any contract that the title to the real property should be conveyed to her; for which reason an error was committed in rendering the decree brought up for review. In *Roberts* v. *Templeton,* 48 Or. 65 (80 Pac. 481, 3 L. R. A. (N. S.) 790), it was held that where the plaintiff, up to the time of his oral purchase of the interest of a tenant in common in a mine, was in possession under a contract with a cotenant of the vendor, so that his prior possession merged into that under his purchase, there was not such a change of possession under the contract as to take the case out of the statute of frauds, and for that reason specific enforcement of the oral agreement would not be decreed. To the same effect, see the case of *Tonseth* v. *Larsen,* 69 Or. 387 (138 Pac. 1080).

1. We do not regard the possession of the real property which was secured and taken by Emily E. Stalker as coming within the rule announced in that case. She came upon the land, it is true, before Mr. Stalker went back to Idaho, never to return; but she was not in possession of the property, nor did she secure a right thereto, as a tenant or otherwise, until he abandoned the premises. It is possible this plural wife might

never have been treated as Hagar and driven off the land as a trespasser by the person so holding the legal title so long as he lived. She was never compelled to pay any rent for the use of the real property, but she could undoubtedly have been evicted if an action had been instituted for that purpose, unless she could have interposed the plea that she took possession under and made valuable improvements pursuant to an oral contract that she was to secure the legal title when she had become so pleased with the new home as not to leave it and return to Idaho and thereupon possibly subject Mr. Stalker to indictment and prosecution for polygamy.

"The mere physical fact of possession," says a noted author, "is not of itself conclusive, nor even material. The possession must be taken and held with the intent of carrying out and executing the agreement. The existence of this intent is vital, and is the essential element which the courts require as a condition of the part performance upon which a decree of specific execution may be based. This intent, however, cannot be shown by proving the verbal contract between the parties, for such a course would be a most vicious arguing in a circle. It must therefore be established by matter outside of the agreement": Pomeroy, Specific Performance (2 ed.), § 116.

As between strangers a change of possession of land is sufficient to take a case out of the statute on the ground of fraud, and a party who has thus secured possession of real property under a parol contract to purchase the premises may enforce, in a suit in equity, a specific performance of the agreement, because otherwise he might be treated as a trespasser: *Coney* v. *Timmons,* 16 S. C. 378. That Mr. Stalker did not drive the plaintiffs and their mother from the land probably resulted from his innate sense of duty to furnish them

a home. If he had died intestate soon after possession of the premises was delivered to the plural wife, it is reasonable to suppose that the defendants, who are the issue of a lawful marriage, could have had no great love for the plaintiffs and would have undertaken to eject them from the land, as is evidenced by an averment in the answer to the effect that Alexander Stalker died seised of an estate of inheritance in and to the real property, and the defendants as his sole heirs at law are entitled thereto.

The possession of real property, when taken pursuant to an oral contract for the sale thereof, is generally held to be such an act of part performance as to take the case out of the statute of frauds, even without any additional circumstance, such as the payment of the consideration, or the making of improvements: Pomeroy, Specific Performance (2 ed.), § 115; *Sprague* v. *Jessup,* 48 Or. 211 (83 Pac. 145, 84 Pac. 802, 4 L. R. A. (N. S.) 410); *Barrett* v. *Schleich,* 37 Or. 613 (62 Pac. 792). In the latter case, however, it was ruled that, when any relation of affinity or consanguinity was shown to exist between the vendor and vendee under a parol contract to convey land, the making of valuable improvements was essential to establish the right to enforce specific performance of the agreement. To the same effect, see *Pugh* v. *Spicknall,* 43 Or. 489 (73 Pac. 1020, 74 Pac. 485).

2. In the case at bar, no direct evidence was offered tending to substantiate the making of the parol agreement, because both parties thereto were dead. Such fact, however, is sought to be established by inference and by declarations against interest made by Mr. Stalker. It must be admitted that the oral admissions of a party ought to be viewed with caution: Section 868, subd. 4, L. O. L. Such avowals may not have

been correctly understood, or accurately remembered so as precisely to be repeated. So, too, in the pretended iteration, words, phrases or sentences may have been purposely misquoted in order to promote a selfish interest. The plaintiff J. L. Stalker testified that at different times he had heard his father say the land in Baker County, Oregon, was for the plaintiffs and their mother. The plaintiff W. R. Stalker testified he had heard his father several times say to his mother: "The place is for you and the children." The stipulated testimony of the plaintiff W. H. Stalker is to the effect that his father and mother were members of the Mormon church, and each had told him they had been married according to the rites of that religious organization.

"That at the time my father left Pine Valley for Idaho he told my mother in my presence that he had bought the place mentioned in the complaint for her and her children, and that he gave it to her, and that it was hers, and that he was going to Idaho and was not coming back, and that he would after a while send her a deed, but that he didn't give her a deed at that time because he was afraid if he did she might become dissatisfied, sell the place, and return to Idaho and get him into trouble, and for that reason he was going to hold the title for a while, but for her to go ahead and improve the place, and that he would give it to her in consideration of her supporting and taking care of his children."

The plaintiff W. R. Stalker, in referring to a conversation he had with Alexander Stalker, testified:

"Father asked why we had gone away to school and hadn't stayed on the place, and I told him we didn't feel a very great interest in the place because he held the deed for it; that he hadn't given us or mother a deed.

"Q. What did he say?

"A. He said, 'You are really better off the way it is, because I pay the taxes.'"

The defendant A. R. Stalker, referring to a conversation he had at Salt Lake City, Utah, with his father, respecting the demand of Emily E. Stalker, testified:

"He said that she had asked him for a deed to the Pine Valley property, but he had not made her any deed, and didn't intend to make her any deed."

Notwithstanding contrary inferences may reasonably be deduced from the testimony, it is believed the oral declarations so imputed to Alexander Stalker, when viewed in connection with the admissions contained in his letters hereinbefore set forth, unmistakably show that a parol contract had been entered into between him and his plural wife, whereby he surrendered to her the land in Baker County, Oregon, and that when he abandoned the premises and returned to Idaho she thereupon took possession of the same and, relying upon his oral agreement to execute to her a deed of the property, made permanent and valuable improvements thereon.

It will be remembered that this suit is predicated on the assumption that Alexander Stalker had duly executed a deed of the land to the plaintiffs' mother and had delivered the sealed instrument to some person to be mailed to her. The prayer of the complaint is that the defendants be required to set forth by answer their alleged claim to the premises, that their asserted right to the land may be quieted and the plaintiffs' title confirmed, "and for all proper and equitable relief." It is possible such deed may never have been executed, as seems to be indicated by the testimony of the defendant A. R. Stalker, who stated upon oath that his

father informed him he had not given the deed and did not intend to make any to Emily E. Stalker. The prayer of the bill being also for general relief, the plaintiffs as the sole heirs of Emily E. Stalker, deceased, are entitled to a specific performance of the terms of the parol agreement whereby she was given possession of the real property and made improvements upon it. The decree of this court, when the mandate is entered in the court below, shall stand as and for a conveyance by each of the defendants of all his right, title, interest and estate in or to the real property described in the complaint, and also each of the defendants and all persons claiming or to claim by, through, or under them, or either of them, any estate or interest in or to the premises or any part thereof, will be barred, and the plaintiffs' title thereto quieted.

The decree of the trial court should therefore be affirmed, and it is so ordered.          AFFIRMED.

---

Motion to dismiss appeal denied September 7, 1915.
Dismissed on stipulation November 29, 1915.