Argued February 27, affirmed March 12, 1952

# HAYWARD *v.* MORRISON ET UX.

241 P. 2d 888

*W. C. Winslow,* of Salem, argued the cause for appellants. With him on the brief was Norman K. Winslow, of Salem.

*Laurence Morley,* of Lebanon, argued the cause for respondent. On the brief were Morley & Thomas, of Lebanon, and Weatherford & Thompson, of Albany.

Before BRAND, Chief Justice, and HAY, ROSSMAN, WARNER and TOOZE, Justices.

TOOZE, J.

This is a suit for specific performance of an oral contract for the sale and purchase of land, brought by

E. H. Hayward, as plaintiff, against N. I. Morrison and Jane Morrison, his wife, as defendants. Decree was entered in favor of plaintiff, and defendants appeal.

The defendants were the owners as tenants by the entirety of the east half of lots 35 and 36, in the city of Scio, Linn county, Oregon. At some time after this appeal was perfected, defendant N. I. Morrison died, and defendant Jane Morrison, as the surviving spouse, and pursuant to law, became vested with legal title to the whole of said premises. It is for that reason that a substitution of the administrator of the estate of N. I. Morrison, deceased, as a party defendant, was deemed unnecessary.

Upon the property above described there is located a building which, prior to September, 1943, housed a pool room, lunch counter, and confectionary store.

Plaintiff is the owner and publisher of a newspaper known as the Scio Tribune; he also is equipped to do commercial printing. His printing establishment is the only one in the city of Scio. Plaintiff acquired the newspaper plant at Scio in 1942. At that time it occupied rather cramped quarters, located about one block from the property owned by defendants. Wishing to expand his operations to meet local demands, which would require new and additional equipment, as well as additional space within which to conduct the business, plaintiff in 1943 entered into negotiations with defendants for the purchase of their property above described. Both defendants participated in those negotiations.

Prior to September 1, 1943, the parties entered into an oral agreement by the terms of which defendants agreed to sell and plaintiff agreed to purchase the premises in question for the price of $2,250, plus the

cost of certain improvements thereof which, as a part of the agreement, defendants promised and agreed to make. It was agreed that the purchase price was to be paid at the rate of $25 per month.

Pursuant to this agreement, plaintiff took possession of the premises on September 1, 1943. In reliance upon the purchase agreement, plaintiff bought and installed considerable new and expensive printing equipment which was operated by electricity and that required additional and special wiring in the building. Also, during the years 1943, 1944, and 1945, plaintiff made several improvements to and repairs upon the building. He constructed lattice work around the bottom of the building to keep animals from getting under the same; he built an extension to the building, put in new flooring, and installed screens for the windows and doors. Additional electric light drops were provided, and a new wall cupboard was constructed. He made some other improvements, but it is unnecessary to mention them in detail. Plaintiff made his payments of $25 per month as required by the contract.

Defendants also made some improvements to the building, pursuant to the terms of the oral agreement. Among those improvements was necessary construction to provide suitable living quarters for plaintiff and his family within the building. As stated before, the cost of these improvements was to be added to the purchase price agreed upon. The plaintiff paid taxes upon the property, and also paid a city sewer assessment, but, strange as it may seem, defendants also paid the same taxes and assessment. It would appear that neither the county nor the city maintained a very good system of bookkeeping. However, we note here that, in making tender of the final amount of the

purchase price, plaintiff offered to reimburse defendants for their expenditures for taxes, with interest, and continued that offer upon filing his complaint in this suit.

The parties did not come to a final accounting until June 14, 1947, as to the exact balance due from plaintiff to defendants upon the purchase price. At that time plaintiff was ready, willing, and able to pay the balance of the purchase price, and demanded of defendants that the matter be closed and a deed delivered to him. He went to the home of defendants on June 12, 1947, and what occurred at that time may best be stated by quoting from plaintiff's testimony as follows:

"Q You went to the home of Mr. & Mrs. Morrison on the night of June 12th, 1947?

"A I did.

"Q Were Mr. & Mrs. Morrison both home?

"A They were both home.

"Q About what time in the evening was it?

"A It was just shortly after dusk, after dark.

"Q Did you go into the home?

"A I did.

"Q You went into the home?

"A I was welcomed in the home and went in and sat down.

"Q Where were they seated?

"A They were seated in the living room listening to a radio program which they said they enjoyed each evening.

"* * * * * *

"Q And after it was over with, did you have a discussion pertaining to this business property?

"A I did.

"Q What was said by you and what was said by Mr. Morrison in Mrs. Morrison's presence?

"* * * * * *

"A I called him by his first name because he

always insisted that I call him Newt instead of Mr. Morrison. I addressed him in that way.

"THE COURT: Now, just a minute. Let's get at what was said. All these explanations as to why, makes a long story and doesn't get us anywhere.

"A I said, 'Newt, did you offer to sell the west 25 foot of my Tribune property to the City or a committee from the City Council?' and he said, 'Why, yes. They inquired for 10 feet, asked if they could purchase 10 feet on the west side, and I told them that they might just as well take all 25 feet if they wanted part of it.' 'Well,' I said, 'Mr. Morrison, you didn't ask me about that arrangement.' He looked up in suprise, he said 'Let's see, that 25 feet did go with your building, didn't it.' He said, 'That's right, I had forgotten that. Well, I didn't make any contract with them. I'll just go to them tomorrow and tell them they can't have it, that's yours.'

"Q Was that said in the presence of Mrs. Morrison?

"A It was.

"Q Was there any further discussion about this property?

"A There was.

"Q What was that?

"A I said, 'Mr. Morrison, this agreement between us has been running a long time. When you were in the hardware store you constantly said that you didn't have time to get together the figures of cost on all of the improvements that you put in the building, and now that you don't own the hardware store any more and you have time to do it, why don't you go ahead and get your figures all up and give me the final figure on that, and let's get this deed taken care of so that I can put additional equipment in that building, which I have been waiting on, so that I can put a cement foundation under the machinery and make further improvements to the building.'

"Q What did he say to that?

"A He said, 'Well, if my wife will sign the deed, I will.'

"Q And did she say she would or not?

"A She said she certainly would be willing to do that.

"Q What else did she say in regard to the delay?

"A Mrs. Morrison said, 'Newt, you ought to be ashamed for keeping this man waiting all this time. You know that he's been waiting to put in other equipment and improve that building further,' and she said, 'that's what you ought to do is go ahead and get that fixed up and give him the deed on that building and let him go ahead and handle the property as he wants.'

"Q Was there much further conversation in that respect that evening?

"A Mr. Morrison said that he would do that the very next day, and he would get the figures together, and he would come to my office and we would fix out the agreement.

"Q Did he come to your office the next day?

"A He came to the office the next day, and I was out of the office at the immediate time, and he returned the following day and dictated the agreement which I wrote on the typewriter and he signed.

"THE COURT: It [sic] that this Exhibit B, that's been offered here?

"A It was.

"Q Now, at that time he brought his figures with him, did he not?

"A He had his figures in his head. He gave me a definite figure of which he said was the total balance that he expected of me.

"Q In other words, this figure here of $3,000.00 is a balance, was what he said that you should pay him in addition to what you had already paid?

"A That's right.

"Q And that's what you agreed?
"A That's what I agreed."

On June 14, 1947, there was prepared, and defendant N. I. Morrison signed, the following written memorandum:

"Scio, Oregon
June 14, 1947

"I, N. I. Morrison, owner of the property concerned, do hereby agree to sell and transfer to E. H. Hayward, present occupant of the property, upon the payment of *a balance* of three thousand dollars, the 50 x 100 foot lots and building (app. 25 x 100 ft. inc. extensions) (Tribune Bldg.) and furnish thereon an insured title. This agreement is hereby entered into with the said E. H. Hayward *in consideration of payments already made, and paid-for improvements added to same.*

"[Sgd.] N. I. Morrison"
(Italics ours.)

Plaintiff had arranged to borrow the money from the Scio State Bank with which to pay the balance due defendants. By direction of defendant N. I. Morrison, plaintiff immediately took steps to secure a title report (to be paid for by defendants), not only for his own purposes, but also for use of the bank. The title report developed a defect, but plaintiff was able to correct this defect without defendants being compelled to resort to a suit to quiet title.

Subsequent to June 14, 1947, plaintiff made other substantial improvements to the building and kept up his payments of $25 per month while the necessary steps were being taken to perfect the title. When the matter was ready for closing, defendants refused to execute a deed.

It was on or about the month of February, 1948, that defendant N. I. Morrison notified plaintiff that

a deed would not be executed, because, as defendant N. I. Morrison claimed, the defendant Jane Morrison refused to sign the same, basing her refusal upon the fact that she had not signed the memorandum of June 14, 1947. Defendant N. I. Morrison demanded that plaintiff vacate the premises or pay a stipulated rental for use of the same. The evidence shows that whatever refusal there was on the part of Mrs. Morrison to sign the deed was qualified and was based upon considerations having nothing to do with plaintiff or his rights.

This appears from plaintiff's testimony as follows:

"Q  And at that time you were told that she wouldn't sign it, weren't you?

"A  I was told in this way. That she was very angry at Mr. Morrison over another transaction, which had nothing to do with my own, and she stated that because she was so angry at her husband over this other deal that she didn't want to sign any more papers for him. That's what she said at that time.

"Q  Well, you learned then that she wasn't going to sign the deed then, didn't you?

"A  At that time she said that she was so angry at him.

"Q  You told us about that, but answer my question.

"A  That's my answer.

"Q  No. Answer my question.

"* * * * *

"THE COURT:  You can answer that question.

"A  I can answer it only in the way she said. She said, 'right now I won't sign it because I'm so angry at him over this other deal.' That's the way she answered me and that is the way I have to give my answer.

"Q  So far as you know, she never changed her mind about it, did she?

"A  So far as I know, she absolutely did change her mind.

"Q  Was she willing to sign the deed?

"A  Yes.

"Q  When?

"A  It's kind of hard to put a date on these things because I just don't keep a notebook, you know, and carry it around with me. Well, it was between that time and this. It was sometime ago.

"Q  She told you, did she, that she'd sign it?

"A  She told me personally that she would not do it for Newt for several reasons, that she was angry at him, but she knew that she had told him that he should give me that deed, and she says, 'I'll go with Newt any time to the bank or to Albany and sign it.'

"Q  Why didn't you get her to do it?

"A  Me get her to do it?

"Q  Yes.

"A  I did try to through her husband.

"Q  Well, you never did, did you?

"A  I certainly did try.

"Q  You got her to sign it?

"A  I certainly did try through her husband, yes. I saw him downtown and told him that I had seen his wife, and that she was ready to sign that deed any time and I said, 'Let's go and get in my car and go have this thing fixed up immediately.'

"Q  What did he say?

"A  Mr. Morrison became very angry with—

"Q  I asked you, what he said. Please, Mr. Hayward, will you answer the question. You understand what a question is, and now answer it.

"A  Mr. Morrison said, 'How do you know?' I said, 'Because I talked with her.' He said, 'When did you see her?' He says, 'Didn't I tell you never

to go to my place and talk to my wife.' That's what he said, and that's how he said it.

"* * * * *

"Q In one of these letters you got here he tells you his wife won't sign. Did you respond to it and tell him that she told you that she would?

"A I talked to him personally, yes.

"Q Did you write him any letter and tell him anything of that kind?

"A I told him personally.

"Q Did you write a letter and tell him that?

"A That his wife was ready to sign?

"Q Yes.

"A No, because he came to me personally the day after I told him and admitted to me that it was him that had been holding it back all the time. He says, 'Now that you know that my wife is willing to sign, I'll admit I'm the one that has been preventing her from signing it.' That was clearly evident because he had told me over quite a period of time he had forbidden me to go to his house and talk to his wife at any time. That extended over quite a period of time, he forbidden [sic] my wife to go to his house, either my wife or myself, and my wife and I did go to his house one time and he just stood right in the door and said, 'Didn't I tell you never to come here and try to see my wife,' so I'm sure that Mr. Morrison was notified that I had seen his wife and talked to her, and there is no doubt about that at all."

It is significant to note that Mrs. Morrison was not called as a witness to refute any of plaintiff's testimony in the case. Therefore, there is no denial on her part that she participated in the original negotiations leading up to the oral agreement of sale and purchase, or that she was fully familiar with the many improvements made by plaintiff on the premises both before and after June 14, 1947.

On the trial, defendants maintained that the sole agreement between the parties was contained in the written memorandum of June 14, 1947, and that parol evidence was inadmissible to vary or explain the terms thereof. They also contended that, the contract being one concerning the sale of real property, it came within the provisions of the statute of frauds. Relying upon the statute of frauds, they asserted that, inasmuch as defendant Jane Morrison did not sign the memorandum, and no evidence was offered to show that she had given written authority to her husband to act as her agent in the transaction, she could not be held bound thereby.

On the other hand, plaintiff insisted that the contract of sale and purchase involved is that originally entered into between the parties by parol, and that by his taking possession of the premises pursuant thereto and making improvements thereon, there was such part performance on his part as to take the agreement out from under the statute. He maintained that the writing itself did not constitute the contract, but was only an incident thereof.

In his complaint, plaintiff alleged that, by her conduct, defendant Jane Morrison is estopped to deny that her husband was fully authorized by her to sign the written memorandum on her behalf, and is also estopped to deny her participation in the making of the oral agreement.

■ We are of the opinion that the contract between the parties consisted of the oral agreement entered into between them prior to September 1, 1943. The only part in the transaction played by the written memorandum of June 14, 1947, was to reduce to certainty the balance due on the purchase price. This was rendered necessary by virtue of the terms of the oral

agreement, whereby defendants were to make certain improvements, the cost of which was to be added to the purchase price. The written memorandum was admissible in evidence as a circumstance tending to show an agreement to sell and purchase, as well as indicating a portion of the parol contract. *West v. Washington Railway Co.,* 49 Or 436, 447, 90 P 666.

At the time the written memorandum was executed, plaintiff had been in continuous possession of the premises for nearly four years, making monthly payments upon the purchase price as agreed. He also had made some improvements at his own expense, a part of which defendants should have made under their agreement. The memorandum significantly states that it is made "in consideration of *payments already made*" and also "paid-for improvements added to same." (Italics ours.) "Payments already made" obviously refers to the monthly payments of $25 on the purchase price. This statement tends to corroborate plaintiff's version of the parol agreement.

Under the statute of frauds an agreement for the sale of real property, or of any interest therein, is void, unless some note or memorandum thereof, expressing the consideration, be in writing and subscribed by the party to be charged, or by his lawfully authorized agent. § 2-909 (6), OCLA. Also is void "an agreement concerning real property made by an agent of the party sought to be charged unless the authority of the agent be in writing." § 2-909 (7), OCLA.

Under this statute, therefore, the agreement in this case is void as against the defendant Jane Morrison, unless under some well-recognized rule of law or equity, the case is taken out from under the operation of that law.

As stated by Mr. Justice LATOURETTE in *Young v.*

*Neill et al.,* 190 Or 161, 166, 220 P2d 89, 225 P2d 66, "The statute of frauds was never designed to shield against the perpetration of a fraud." Where one party in addition to taking possession of the premises and paying on the purchase price performs other acts pursuant to the terms of an oral contract of sale and directly referable thereto, such as materially changing his position to his disadvantage, making substantial improvements or repairs to the premises, or otherwise doing something which he would not have done but for the agreement and which would result in substantial injury to himself if the other party were permitted to hide behind the statute of frauds and disavow the same, and when the other party has received and enjoyed the benefits of the oral agreement, equity will step in and compel specific performance, the other party being estopped to set up the statute as a defense.

■ The foundation of this doctrine is fraud; not necessarily an antecedent or positive fraud, but a fraud inhering in the consequence of this setting up the statute. It applies where to permit the defense would be inequitable and unconscionable. *Young v. Neill et al.,* supra; *Dunis v. Director et al.,* 121 Or 500, 507, 255 P 474; *Riggs v. Adkins,* 95 Or 414, 418, 187 P 303; *Cantwell v. Barker,* 62 Or 12, 124 P 264; *Seymour v. Oelrichs,* 156 Cal 782, 106 P 88, 134 Am St Rep 154; *Walter v. Hoffman,* 267 NY 365, 196 NE 291, 101 ALR 919, and note commencing at page 926; 37 CJS, Statute of Frauds, 753, § 247.

The rule that part performance of an oral agreement to convey land will take the case out from under the statute of frauds is well stated in Pomeroy, Specific Performance of Contracts 3d ed, 283, § 115, as follows:

"Possession alone of land, under a verbal contract, when delivered to the *vendee* or lessee, or

taken by him with the consent of the *vendor* or lessor, or with the knowledge which implies such consent, is an act of part performance which takes the case out of the statute of frauds, even without the additional circumstances of the payment of consideration, or the making of improvements. This rule is settled by an overwhelming weight of authority in England and in this country * * * ." (Italics ours.)

Also see *Stalker v. Stalker,* 78 Or 291, 298, 153 P 52; *Barrett v. Schleich,* 37 Or 613, 617, 62 P 792.

We are not particularly concerned in this case with the failure of defendant Jane Morrison to sign the memorandum of June 14, 1947, or her failure to execute written authority for her husband to sign it in her behalf as her agent. Defendant Jane Morrison was an active party to the making of the original agreement, and is just as much bound thereby as is her husband. It is the original agreement that is to be specifically enforced, if specific performance will lie under the facts of this case.

■ However, if the agreement to be enforced consisted only of the writing of June 14, defendant Jane Morrison would be equally bound thereby on the theory of an equitable estoppel. She knew that plaintiff went into possession of the premises on September 1, 1943, and that he made valuable improvements thereon, both before and after June 14, 1947; she knew of the payments he was making on the contract; she actively participated in the discussions respecting the final closing of the matter on June 12, 1947, and knew of and acquiesced in her husband's agreement to meet with plaintiff the next day for the purpose of reaching a final settlement and closing the transaction. During all the period of time elapsing between September 1, 1943, when plaintiff went into possession of the premises,

and some time in 1948, she stood by without making any objections whatever to plaintiff's actions in making improvements, and without notifying plaintiff that he could not rely on receiving a deed of conveyance from her. In fact, she never did unequivocally state to plaintiff that she refused to execute the deed, in keeping with the contract. On the contrary, long after her husband had told plaintiff that she would not join in executing the deed, defendant Jane Morrison assured plaintiff of her willingness to do so. In such circumstances, said defendant is estopped to take the position now assumed for her in this litigation. By her conduct and silence, when it was her duty to speak if she was dissatisfied with conditions, she is now precluded from asserting a right which she might otherwise have had. *Young v. Neill et al.*, supra; *Marshall v. Wilson*, 175 Or 506, 518, 154 P2d 547.

In the instant case everything done by the parties was directly in pursuance of and referable to the oral contract, including the execution of the written memorandum of June 14, 1947. The taking of possession of the premises by plaintiff; his making of valuable improvements thereon; the purchase and installation by him of expensive equipment in reliance upon his having purchased the property; the money he paid to, and which was received and accepted by, the defendants, on the purchase price; the construction of additional improvements upon the building by defendants, pursuant to the agreement, all constituted acts of part performance which were performed in strict accordance with the oral agreement and directly in reference thereto. In such circumstances it would result in gross injustice and be wholly inequitable and unconscionable to permit defendant Jane Morrison to now take a position completely at variance with her prior

acts and conduct. *Meads v. Stott,* 193 Or 509, 238 P2d 256, 267.

■ We are not unmindful of the fact that as to some matters there is a sharp dispute in the testimony. Neither have we overlooked the argument of defendants respecting the failure of plaintiff to produce his cancelled checks showing the monthly payments to defendants. We do note, however, that defendants' demand to produce the checks came very near the close of the case, and no request was made that the trial be continued until they could be produced. These facts tend to destroy the effect of defendants' present contention regarding the same. Nevertheless, all these problems were before the trial judge for solution. As we have so often said, in equity proceedings the findings of the trial judge upon disputed facts are entitled to great weight. They should not be disturbed in this case.

The decree is affirmed. Plaintiff is entitled to costs.