Argued October 6, affirmed November 30, 1966

In the Matter of the Estate of
N. PERRY MOERDYKE, Deceased
GENTRY et al *v.* LANE
420 P. 2d 637

*Robert W. Hill,* Eugene, argued the cause and filed the briefs for the appellant.

*Richard Bryson,* Eugene, argued the cause for respondents. On the brief were Calkins & Bryson, Eugene.

Before McALLISTER, Chief Justice, and PERRY, O'CONNELL, DENECKE and REDDING, Justices.

REDDING, J. (Pro Tempore).

This is an appeal by Lillian Smith Lane, executrix of the estate of N. Perry Moerdyke, deceased, from an order sustaining four of twelve objections made to her final account.

The first question presented is whether the executrix of the estate was justified in leaving out of the final account two $10,000 U. S. Government bearer bonds. These bonds were listed in the inventory and appraisement. The second question presented for determination is whether the executrix was justified in paying to herself, pursuant to an ex-parte court order, $125 per month for the period from September, 1963 through September, 1964, a total of $1,625, as extraordinary executrix's fees for living in the decedent's residence in order to prevent vandalism and preserve the personal property located therein, and whether she was justified in paying her husband, Squire A. Lane, $100 per month from September, 1963 until the decedent's residence was sold in June, 1965, a total sum of $2,200, for serving as gardener and watchman of said residence.

The testator's true name was N. Perry Moerdyke. He had practiced law in Los Angeles, California for 40 years. While his family was absent on vacation in August, 1951, he left without disclosing his destination or whereabouts, secured a divorce in Reno, Nevada, married Marie Black Barkley, a widow, who had served as his secretary for 25 years, and moved to a secluded area near Florence, Lane County, Oregon, where he built a home on Woahink Lake and lived

under the assumed name of R. M. Barkley. He remained anonymous and out of touch with his family and friends for more than 11 years. Indeed, his family did not know of his whereabouts until after his death.

Mrs. Lane, the executrix and appellant herein, worked as housekeeper and nurse for the testator and his wife, Marie Black Moerdyke, from January 3, 1961 until the death of Mrs. Moerdyke on January 16, 1963, and for the testator from January 16, 1963 until his death on August 24, 1963. During this period she worked seven days a week, 10 or more hours per day. In April, 1961 Mr. Lane also went to work for the Moerdykes as gardener and handy man.

Decedent's wife was in bad health from the time Mrs. Lane went to work for the Moerdykes. She was in a wheelchair at times during the day but was confined to her bed most of the time. Decedent suffered increasingly poor health. He suffered from dysentery, had trouble with his legs and eyes, had hypertension, heart trouble, high blood pressure, and became practically helpless. For some months before his death, Mr. Moerdyke was almost completely dependent on the Lanes. The last month of his life he was practically bedfast and both Mr. and Mrs. Lane moved into his home. Mrs. Lane had access to his files, records, papers and securities. Mr. Lane did Mr. Moerdyke's banking. After Mrs. Moerdyke died, Mr. Moerdyke, on February 6, 1963, executed a will leaving $5,000 and other property to Mr. Lane, $10,000 and other property to Mrs. Lane, and named Mrs. Lane as executrix of his will and named Mr. Lane as substitute executor. The testator died at 79 years of age on August 24, 1963 leaving an estate valued at more than $350,000. Mrs. Lane was duly appointed executrix of the estate.

Mrs. Lane states that under her original employment agreement with the Moerdykes, she was to be paid at the rate of $2 per hour for week days and $2.50 per hour for Sundays. She claims that approximately two weeks after her employment started, the employment agreement was changed at Mr. Moerdyke's suggestion. She asserts that she then agreed to work a minimum of two years in consideration of being paid two $10,000 U. S. Government bearer bonds at the end of said two-year period. In the lower court and here, Mrs. Lane claims that the bonds in question were delivered to her by decedent in October, 1962 as payment for her services for an agreed period of two years. She claims that these bonds were in her possession or in the possession of her daughter from October 22, 1962, when she claims they were given to her by the decedent, until July 30, 1963. On that date she, her husband, and the testator jointly opened a safety deposit box in the Umpqua National Bank at Reedsport, Oregon. Mrs. Lane asserts that on that occasion she placed a brown, unsealed envelope, on which she had written her name and which contained the two $10,000 government bearer bonds, in the jointly held safety deposit box. It is conceded that the testator on this occasion, because of circumstances related to his condition of health, remained in his car outside the bank and entrusted to the Lanes or the employees of the bank the placing of his securities of substantial value in the joint safety deposit box. The box was not entered again until after the death of the testator.

The objectors contend that Mrs. Lane was paid daily in cash during the entire period she was employed as housekeeper-nurse by the testator and his deceased wife. The objectors deny that the bearer bonds in question were given to Mrs. Lane by the de-

cedent. If Mrs. Lane was paid daily in cash, her claim
to the two bonds must fall. On this question, one of
the objectors, Priscilla N. Gentry, decedent's daughter
and the wife of a physician practicing in San Marco,
California, testified that she learned of her father's
death after his funeral and came to Oregon on Sep-
tember 4th. She talked with Mrs. Lane at the deced-
ent's home on September 5th. Mrs. Gentry testified
as follows concerning her conversation with Mrs. Lane
at that time and place:

"Q  Well, now at this first meeting of yours
with Mrs. Lane did you inquire whether anything
was owing to her for her previous services?

"A  I did.

"Q  And what was her answer?

"A  I said to her, 'I am very glad my father has
had someone to take care of him.' And she immedi-
ately told me about Mrs. Barkley's death, and I
said, 'Well, now, Mrs. Lane, do we owe you any-
thing?' And she said to me, 'No, you don't owe
me a thing. Your father paid me every night.'"

A second objector, N. Perry Moerdyke, Jr., de-
cedent's son and a practicing attorney in Palo Alto,
California, learned of his father's death two days after
the funeral and came to Oregon on September 16th.
On September 17th he called on Mr. Seymour, attor-
ney for the executrix. Concerning his conference with
Mr. Seymour, Mr. Moerdyke, Jr. testified as follows:

"Q  Now, did you have any conversation with
Mr. Seymour on the morning of the 17th of Sep-
tember about whether any money was owing to
Mrs. Lane for her services to your father?

"A  That was one of the—one of the questions
I asked Mr. Seymour.

"Q  And would you just tell the Court what the conversation was?

\*  \*  \*  \*  \*

"A  He stated that he had made such an inquiry of Mrs. Lane, and that she had stated she was paid in full and had been paid in full in cash every night. And I asked him, I said, 'Do you mean that she was paid in cash every night for three years?' He said, 'Every night for three years.'

"Q  And was there any discussion with Mr. Seymour on that occasion about the two government bonds that are in controversy here?

"A  There was.

"Q  Would you relate what that was?

"A  May I preface that by saying I asked him several questions relating to assets based on information I had received from Mr. Hoffman and Doctor Gardner who were familiar with this aspect of it. Mr. Hoffman had prepared a prior will for my father, and I asked him questions relating to information I had received from them, and I also asked him the usual questions concerning an opportunity to examine his last bank statement—my father's last bank statements, whether there were any traveler's checks, whether there was any money in his wallet, and he responded promptly. He indicated that there were two ten thousand dollar bonds and that they were being inventoried and they were in the safety deposit box.

"Q  Did he say anything to you at that time about any possible claim by Mrs. Lane—

"A  He did not.

"Q  —to those bonds?

"A  He did not."

Later on the same day, or on the following day, Mr. Moerdyke, Jr. visited Mrs. Lane at the decedent's home. Mr. Moerdyke, Jr. testified as follows concern-

ing his conversation with Mrs. Lane at that time and place:

> "A * * * I then asked her, I said, 'Now, I'd like to be sure that what Mr. Seymour has told you is correct: that you have no claims against the estate.' She said, 'No, I was paid every night in cash.' She said, 'It was very peculiar, but I was paid every night in cash.' And I said, 'Were you paid every night in cash for three years?' And she said, 'For three years.'"

Interest coupons attached to each of the bonds here in question fell due on February 15 and August 15 of each year during the term of the bonds. Duplicate bank deposit slips in the decedent's handwriting found among his papers and received in evidence disclosed that on July 30, 1963, the deceased caused to be deposited to his account with the Umpqua National Bank the two coupons totaling $300 which matured on February 15, 1963. The duplicate deposit slip identifies the subject of the deposit as follows:

"U. S. Treas. Bonds, 2 coupons due Feb. 15, 1963 at $150.00                                         $300.00"

A similar deposit slip dated August 15, 1963 shows a deposit of the coupons which became due August 15. The subject of the deposit is identified as follows:

"U. S. Treas. Bonds, 2 coupons due Aug. 15, at $150.00                                         $300.00"

The coupons, like the bonds, were cashable by the bearer thereof. If the bonds were in fact given to Mrs. Lane in October, 1962 as she claims, these coupons which matured many months thereafter would likewise belong to her and would have been in her possession when they matured. Mrs. Lane sought to explain the deposit of these coupons to decedent's ac-

count by testifying that she needed $600 in cash in connection with the remodeling of her home and prevailed upon the decedent to cash the coupons for her in June, 1963 and that he in turn later deposited them to his account. Mrs. Lane does not explain why she asked the deceased to cash in June the two coupons that matured on February 15 when she or Mr. Lane could have obtained the cash therefor at any bank.

Mr. Donald Seymour, the attorney for the estate, was the first person to enter the box after July 30, 1963, the date on which it was rented and the securities placed therein. He entered the box for the purpose of preparing an inventory of the assets of the decedent's estate. In the safety deposit box with the testator's other securities, he found the two $10,000 government bearer bonds in an unsealed, brown envelope bearing the executrix's name in her handwriting. He listed the two bonds in the inventory of the estate. Mr. Seymour and Mrs. Lane testified that she signed the inventory and appraisement on December 16, 1963 without reading the same. The inventory was filed with the bonds included therein. Mrs. Lane testified that when she read the inventory later, she discovered for the first time that the two bonds had been included in the inventory. She testified that shortly thereafter she notified Mr. Seymour that she claimed the bonds as her property.

In February, 1964, N. Perry Moerdyke, Jr., decedent's son, learned for the first time through Donald Seymour, Mrs. Lane's attorney, that Mrs. Lane was claiming the bonds here in question. Decedent's son and daughter, both residuary legatees, upon learning that Mrs. Lane claimed that she had been given the bonds by decedent in payment for her services, imme-

diately retained Mr. Lewis Hoffman, an attorney of Eugene, to represent them in the matter. After resigning as attorney for the son and daughter that he might testify in the within matter, Mr. Lewis Hoffman testified that Mr. Seymour advised him on March 13, 1964 that Mrs. Lane, having been advised by him, Seymour, and independent counsel, Mr. Mumford, an attorney of Eugene, that she probably would be removed as executrix and be denied an executrix's fee if she persisted in asserting her claim that she owned the bonds, informed him that she had decided to abandon her claim to the bonds.

Mrs. Lane did not file an income tax return listing the $600 she claims she received from the decedent in June, 1963 covering the coupons until November, 1964. Could it be that by November, 1964 Mrs. Lane concluded that the possibility of her removal as executrix and resulting loss of her fee as such had passed, and that she belatedly filed this tax return in an attempt to give credence to the claim which not until then had she determined to prosecute?

The trial court file reveals the following:

(a) In April, 1964, Mrs. Lane filed a state inheritance tax report and thereafter took a court order determining the inheritance tax in both of which she submitted these bonds as assets passing to the residuary beneficiaries. By so doing she caused the estate, and thereby the residuary legatees, to pay state inheritance taxes on these bonds.

(b) In May, 1964, she filed her petition for partial payment of her executrix's fee in which Mrs. Lane set forth under oath that her fee was an amount computed on the total inventory of the estate, including

these bonds, got the court to approve the petition and drew part of that fee.

(c) In November, 1964, Mrs. Lane filed a federal estate tax report again listing these bonds as part of the decedent's estate. By so doing she caused the estate to pay the federal estate tax thereon out of the residue of the estate, thus reducing the residue to the prejudice of the residuary legatees.

On July 1, 1965, Mrs. Lane prepared and filed her final account in which she said that these bonds were her own and for that reason not included in the accounting. She asked that her accounting be approved and the estate closed.

We are here confronted with a most unusual factual situation. Objectors contend that Mrs. Lane was paid daily in cash for her services over a period of 31 months. Is this contention so improbable, so contrary to human experience, as to be unworthy of belief? Why did decedent, a lawyer, with a checking account in a local bank, pay his nurse and housekeeper in cash? Why daily? We note that Mr. Lane, husband of the executrix, was also employed by the deceased at an hourly wage during most of the same period that Mrs. Lane was employed. Mr. Lane was called as a witness by the executrix. Concerning the manner in which he was paid, he testified as follows in response to questions put to him by the able and discerning trial judge:

"Q (By the Court) Now, when you were paid from the time you went to work in, you said, March of 1961.

"A Correct that, please. April, please.

"Q April—

"A Yes, sir.

"Q —of 1961 through July of 1963, how were you paid? Were you paid every month, every week, every day or just how?

"A Part time every day and sometimes be a little short of change and it would probably lapse over for maybe a day or two days until he would get more change in. I was paid in cash all the time.

"Q You were paid in cash all the time?
"A That's right.

"Q And you never received a check?
"A No, sir. Not one.

"Q And it never went for more than two or three days at a time?
"A Never."

It is suggested that possibly the deceased desired to avoid reports required of an employer, such as withholding statements and social security returns. There well might have been other reasons. The decedent was a most unusual man. As counsel for appellant points out in his brief:

"* * * Mr. Moerdyke was not an ordinary individual. A normal person does not run away from home with his secretary and remain anonymous and out of touch with his family or friends for 11 years. The normal person does not put himself in a position of hiding out from the world, relying on strangers for the physical care of himself and his wife. * * *"

We do not know from the record, and probably never will know precisely what the motives of the deceased were in acting as he did. This review of the evidence shows that on different occasions Mrs. Lane stated to at least three persons that she had no claim against the estate. On each of these occasions, she specifically disavowed any claim on account of compensation for services. The bonds now claimed by her

were originally listed by her as assets of the estate. Compensation was claimed by her for services as executrix based upon the appraised value of the assets of the estate, including the amounts of the two bonds. Subsequent to the time when Moerdyke is claimed to have delivered the bonds to Mrs. Lane, he, and not Mrs. Lane, cashed the coupons thereon. Mrs. Lane's explanation for this is unconvincing. Her income tax return listing the amount purportedly received from the coupons as income appears most probably to be an afterthought.

The preponderance of the evidence leads us to conclude, as did the trial court, that the bonds were not given to Mrs. Lane as compensation for her services, or otherwise. We find that she was fully compensated for such services daily in cash and that the bonds, together with the interest thereon, formed a part of the estate of the testator.

The executrix, pursuant to an ex-parte order, disbursed to herself a total of $1,625 as extraordinary executrix's fees for living in the decedent's residence, and disbursed to Squire A. Lane, her husband, the total sum of $2,200 for serving as gardener and watchman of the decedent's residence. The executrix contends that the court erred in disallowing these disbursements as charges against the estate. No purpose would be served by here reviewing the evidence upon this question. Suffice it to say, we find that the trial court properly refused to allow the executrix claims for extraordinary fees for herself and for disbursements to her husband. The services claimed to have been rendered did not afford any substantial benefit to the estate. We might add that the trial judge's findings, particularly in a case such as this, are entitled to much weight. As this court so ably stated in

*Chatterton v. Chatterton,* 208 Or 434, 435, 301 P2d 1034 (1956):

> "We have carefully read the record. It comes to us impressed with the advantages that a trial judge has but which are denied to us. The trial judge can give weight to the testimony of the witnesses as he sees and knows them on the stand and can take into account their conduct while testifying under oath. Oft-times the tone of voice is more eloquent than the spoken word, the readiness of response, or the slow and carefully worded answer give greater clue to the honesty or want of forthrightness of the one testifying than we can glean here from the written record alone. Therefore, when in doubt, and we have none here, our doubts are necessarily resolved in support of the jurist who saw and heard the witnesses. *Hayward v. Morrison,* 194 Or 335, 351, 241 P2d 888; *Claude v. Claude,* 180 Or 62, 79, 174 P2d 179. \* \* \*"

The order of the circuit court sustaining objections numbered 1 through 4, both inclusive, to the final account filed by the executrix, is affirmed with costs to the respondent.

Affirmed.